THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 1 2 2011

CLERK, U.S. DISTRICT COURT
By _____
Deputy      11:53 AM

| | |
|---|---|
| **DONALD STOTT,**<br>**Plaintiff,**<br><br>**v.**<br><br>**CAPITAL FINANCIAL SERVICES,**<br>**INC.,**<br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ Case no. 3:11-cv-2073-F |

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT WITH CAPITAL FINANCIAL SERVICES, INC.

BEFORE THE COURT is Representative Plaintiff Donald Stott's Motion for Final Approval of Class Action Settlement with Capital Financial Services, Inc., filed on February 18, 2011 (*Stott* Docket No. 2).[1] The Court held two separate fairness hearings regarding this Motion on April 8, 2011 and August 10, 2011. Certain individual class members previously filed objections to the proposed settlement; however, several of these objections were withdrawn shortly before the August 10, 2011 hearing.

In addition to the issues surrounding approval of the proposed settlement under the relevant provisions of Federal Rule of Civil Procedure 23, this proposed settlement raises

---

[1] This Motion was originally pending as Docket No. 213 in *Joseph Billitteri v. Securities America, Inc.*, 3:09-cv-1568-F. On August 19, 2011, by an Order issued in the *Billitteri* case (*Billitteri* Docket No. 488), pursuant to Federal Rule of Civil Procedure 21, the Court severed all claims by Representative Plaintiff Donald Stott against Capital Financial Services, Inc., creating the above-captioned new cause of action of *Donald Stott v. Capital Financial Services, Inc.*, No. 3:11-cv-2073-F, in the interest of allowing for a more efficient disposition of this matter and entrance of final judgment in regard to the claims contemplated by this Motion.

two particularly novel and important issues: (1) whether the Court may approve the settlement under a "limited fund" theory, which is a rare settlement device that does not permit class members to opt out and must satisfy the requirements of Rule 23(b)(1)(B); and (2) whether, in the course of approving this settlement, the Court has the authority to enjoin arbitrations brought by class members against the settling defendant under the All Writs Act. The Court believes that these two issues are of paramount importance and require the significant analysis contained in this Order.

After considering the Motion, the briefs and submissions to the Court, and the objections of class members, it is ORDERED that the Representative Plaintiff's Motion for Final Approval of Class Action Settlement with Capital Financial Services, Inc. is GRANTED.[2]

## I. Factual Background and Terms of the Proposed Settlement

This class action arose out of an alleged Ponzi scheme related to an entity known as Provident Royalties, LLC ("Provident"). Provident's purported business was the development of oil and gas properties, and the Provident securities were sold as preferred stock and partnership interests in a series of shale gas ventures. Provident securities issued by affiliates of Provident were sold by a number of broker-dealers, including Capital Financial Services, Inc. ("Capital Financial"). In total, Provident raised over $400 million from investors, and Capital Financial sold approximately $65 million of Provident securities to over 650 investors. Capital Financial sold Provident securities by

---

[2] This resolves *Stott* Docket No. 2.

2

the use of Private Placement Memoranda ("PPMs"), which the Representative Plaintiff contends contained untrue statements of material fact and omitted material facts about the Provident entities.

In 2009, an SEC investigation revealed that Provident was in fact a Ponzi scheme, and upon Provident's entrance into bankruptcy, many investors lost the bulk of their investments. The Representative Plaintiff in this case, Donald Stott, as part of a suit with several other representative plaintiffs who had invested in Provident through other broker-dealers, filed suit against Capital Financial in an attempt to recover the investments of those who had purchased Provident securities through Capital Financial, alleging violations of federal and state securities laws, negligence, and breach of fiduciary duty. The Representative Plaintiff asserted that Capital Financial had failed to perform proper due diligence on the Provident securities, sold the securities that contained material misrepresentations, breached its duties to investors in selling the securities to them, and sought restitution of the lost funds on behalf of a class of investors who bought Provident Securities through Capital Financial. The Representative Plaintiff also asserted claims against Capital Financial Holdings, Inc. ("Capital Holdings"), Capital Financial's parent company. The original case, *Billitteri v. Securities America, Inc.*, 3:09-cv-1568-F, was filed in the Northern District of Texas on August 24, 2009. Members of the proposed class are investors who purchased Provident securities through a Capital Financial broker-dealer between 2006 and January 2009, when Provident suspended dividend payments.

3

While this class action has proceeded, a number of investors who purchased Provident securities from Capital Financial, who are members of the proposed class, pursued arbitrations against Capital Financial, and in some cases certain registered representatives affiliated with Capital Financial, under the auspices of the Financial Industry Regulatory Authority ("FINRA"). Such arbitrations were provided for in the investors' contracts with Capital Financial. The arbitration claimants sought a total of $11,830,000 in damages. In the months following this case's filing, the class action and the individual arbitrations moved forward on parallel tracks. Additionally, the Liquidating Trustee of the Provident Royalties Liquidating Trust created by the Bankruptcy Court, Milo Segner, pursued claims against Capital Financial assigned by class members to the Trust in a related case brought in Bankruptcy Court. That case eventually came before this Court after the reference to the Bankruptcy Court was withdrawn on November 23, 2010, and is currently captioned *Segner v. Securities America, Inc.*, 3:10-cv-1884-F. Capital Financial is a defendant in the *Segner* case.

On December 21, 2010, the Representative Plaintiff and Capital Financial filed a Motion for Preliminary Approval of Class Action Settlement (*Billitteri* Docket No. 151), seeking the Court's approval of a proposed settlement under Federal Rule of Civil Procedure 23(b)(1)(B). The proposed settlement would release claims against Capital Financial, its insurer, Arch Specialty Insurance Company ("Arch"), and a number of individuals, including Capital Financial's current and prior officers and directors and registered representatives. In the later stages of the settlement approval process, the

4

settling parties decided that the settlement would only release those individuals who provided their financial information to the Court so it could more accurately assess whether a true "limited fund" existed. Notably, the proposed settlement does not release claims against Capital Holdings, and Capital Holdings remains a defendant in the original *Billitteri* action.[3]

The proposed settlement fund consists of approximately $1,520,000. The settlement fund was compiled from two sources. The first source consists of approximately $1,400,000 that remains of Capital Financial's $2,000,000 applicable insurance sub-policy with Arch that covers all claims related to Capital Financial's sale of Provident securities. Capital Financial's insurance policy with Arch can be found at *Billitteri* Docket No. 170-14.[4] The policy is a "wasting policy" in which all defense costs are deducted from the available coverage. Approximately $550,000 of this policy has been expended in attorneys' fees in defense of claims against Capital Financial. The remainder of the policy was preserved by the Court's enjoining of individual claims against Capital Financial, which shall be discussed further in this Order. The entirety of the remainder of the policy shall be contributed to the settlement.

The second source of the settlement fund consists of a $120,000 payment from Capital Financial's net surplus regulatory capital. FINRA determined that Capital

---

[3] On August 8, 2011, class counsel filed a supplemented memorandum in the *Stott* case (*Stott* Docket No. 27) and informed the Court that a mediation had taken place on May 20, 2011, in which a number of parties attempted to reach a settlement with Capital Holdings. That mediation was unsuccessful, but settlement efforts with Capital Holdings appear to be ongoing.

[4] The applicability of the $2 million sublimit, as opposed to the $5 million aggregate limit, is discussed later in this Order.

Financial could afford to pay $200,000 from its surplus net capital without putting itself in imminent jeopardy of violating the SEC's net capital rule, which requires a broker-dealer to maintain a certain amount of liquid assets. *See* 17 C.F.R. § 240.15c3-1. FINRA has made an independent determination that $120,000 of that $200,000 should go to the payment of claims arising from the sale of Provident securities, and $80,000 for the payment of claims should go to the payment of claims arising from the sale of securities for Medical Capital Holdings, a related entity that was also revealed to be a Ponzi scheme in 2009. As established at a hearing held in January 2011, the total amount of net capital available at the time that FINRA made the determination that $200,000 was all that Capital Financial could afford to contribute to a settlement without running afoul of SEC regulations, Capital Financial's total net capital was approximately $266,000. *See* Stott App., *Stott* Docket No. 22, at 16-17. According to FINRA, compelling a direct contribution of any more than $200,000 would bring Capital Financial perilously close to regulatory violations and potential insolvency. FINRA has advised the parties that this $120,000 Provident contribution is to be distributed in accordance with the order of this Court, and FINRA's representative, Marshall Gandy, made similar representations at a hearing held by this Court in January. *See* Stott App., *Stott* Docket No. 22, at 5-7. These two concrete sources constitute the total settlement fund.

Among the provisions of the proposed settlement is the Court's ordering a stay and eventual injunction on all litigation and arbitrations brought by individual members of the class against Capital Financial. When the original Motion for Preliminary Approval of this settlement was filed on December 21, 2010 (*Billitteri* Docket No. 151),

6

the Settling Parties contended that the Court had the authority to take such an action under the All Writs Act.   On December 23, 2010, the Representative Plaintiff filed a Motion for Temporary Restraining Order (*Billitteri* Docket No. 156), which asked the Court to exercise its authority under the All Writs Act to enjoin an arbitration scheduled to begin on January 3, 2011 in North Dakota brought by two individual investors, a Mr. and Mrs. Benson, who would be members of the proposed settlement class against Capital Financial and affiliated individuals.   The Court granted the Motion for Temporary Restraining Order on December 28, 2010 (*Billitteri* Docket No. 159).   Objections to preliminary approval of the proposed settlement were filed by several groups of intervenors known as the Campen Intervenors and the Erickson Intervenors (*Billitteri* Docket Nos. 166 & 182), two objectors to the proposed settlement, Donald and Marva Lattimer (*Billitteri* Docket No. 185), and Milo Segner, the liquidating trustee for the Provident Royalties Liquidating Trust that was created by the Bankruptcy Court (*Billitteri* Docket No. 160).

The Court held a preliminary approval hearing on January 3, 2011 and a teleconference with counsel for various interested parties on January 11, 2011.   On January 11, 2011, the Court issued an Order exercising its authority under the All Writs Act preliminarily enjoining arbitration procedures brought by members of the proposed settlement class against Capital Financial (*Billitteri* Docket No. 188) pending the Court's decision on final approval of the proposed class action settlement.   On January 25, 2011, the Court issued an Order (*Billitteri* Docket No. 192) preliminarily approving of the settlement and approving class notice.   After the Court granted preliminary approval of

the settlement, three members of the class, Terry and Carolyn Stanfield and Christine Meengs, filed virtually identical objections to the settlement (*Billitteri* Docket Nos. 255 and 262), which, unlike the objections of the Campen and Erickson Intervenors, have not been withdrawn. Jac and Judith Slominki sent a letter to the Court dated February 24, 2011 objecting to the settlement, and the aforementioned Mr. and Mrs. Benson also maintain an undocketed objection dated March 2, 2011.

The Court held a fairness hearing on April 8, 2011, at which the Court heard the testimony of John Carlson, the president and chief compliance officer of Capital Financial, as to the financial condition of Capital Financial. As part of this testimony, the Representative Plaintiff submitted quarterly financial reports and other financial documents relating to Capital Financial that confirmed the small amount of capital available from Capital Financial's net surplus capital for purposes of this proposed settlement. The Court also heard arguments regarding approval of the settlement and the objections of various intervenors and class members, including groups identified as the Campen Intervenors and the Erickson Intervenors. Each of these groups consisted of individuals who had brought their claims against Capital Financial to arbitration, and, at the time, objected to several provisions of the settlement. After hearing their arguments, the Court determined that their concerns deserved further consideration and asked the parties to submit more up-to-date information regarding Capital Financial's financial position and the financial information of individual Capital Financial broker-dealers, who would be released from liability were the settlement to be approved. This information was submitted prior to the Court's second fairness hearing. The information provided to

8

the Court, including updated FOCUS reports for the first part of 2011, confirmed that net capital remained close to the levels determined by FINRA, and supported FINRA's continuing assertion that a $120,000 contribution to the proposed settlement fund was all that could be afforded without provoking a regulatory violation. *See* Stott App., *Stott* Docket No. 25, at 5-39.

The Court held a second fairness hearing on August 10, 2011. One day before the fairness hearing, the Campen Intervenors and the Erickson Intervenors withdrew their objections to the proposed settlement, leaving several individual objections to the settlement remaining, including the docketed objections of Christine Meengs and Terry and Carolyn Stanfield. At the second fairness hearing, the Court considered the arguments of class counsel, counsel for Capital Financial, and the testimony of Mitchell Willis Carter, an expert witness who opined that the settlement "provides for the . . . maximum material amount that Capital Financial Services could provide and still have an opportunity to continue in operations." Transcript of August 10, 2011 Hearing, *Billitteri* Docket No. 487, at 24. The Court also considered the additional financial information submitted by the parties and the financial information submitted by certain Capital Financial individual broker-dealers.[5] At the hearing, class counsel reiterated its contentions that the proposed settlement fund encompassed all of the funds that could possibly be obtained from Capital Financial without forcing the company to become

---

[5] The Court also heard arguments about the pending Motion for Attorneys Fees and Reimbursement of Expenses in connection with this proposed settlement (Docket No. 5). The Court shall address this Motion in a separate Order.

insolvent, and that there were no appreciable assets that could plausibly be obtained from individual broker-dealers without cost that would outweigh any benefit to the class. Shortly after the August 10, 2011 hearing, the Court granted a joint motion to sever Stott's claims against Capital Financial into the above-captioned action. *See* Order, *Stott* Docket No. 1.

Although a number of the objections to the settlement have been withdrawn, the Court is still faced with several important issues that must be addressed if the Court is to approve this proposed settlement. First, the Court must assess whether the traditional requirements of Rule 23(a) for the approval of a class action settlement are met. Second, the Court must address whether a "limited fund" exists under Rule 23(b)(1)(B). Third, the Court must determine whether this Court has the authority to enjoin arbitrations brought by individual class members as a part of the settlement agreement. Fourth, the Court must determine whether there has been proper notice in this case and whether Girard Gibbs LLP and Zwerling, Schachter & Zwerling, LLP should be appointed as class counsel for purposes of the settlement. Finally, the Court must address whether the requirements of Rule 23(e) for approval of class action settlements are met. The Court shall address each of these issues in turn.

## II. Requirements of Rule 23(a)

A district court has wide discretion in deciding whether or not to certify a proposed class. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471-72 (5th Cir. 1986). However, that discretion is not unlimited; the Court must undertake a "rigorous analysis" to ensure that the requirements of Rule 23(a) are met. *General Tel. Co. of Southwest v.*

*Falcon*, 457 U.S. 147, 161 (1982). "Rule 23(a) requires that the proposed class representatives demonstrate numerosity, commonality, typicality, and adequacy of representation." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007). The Court shall address each of these Rule 23(a) factors in turn.

### 1. Numerosity

Numerosity is satisfied when the proposed class is "so large that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623 (5th Cir. 1999) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)). The proposed settlement class includes at least 650 investors. A class of such a size is comparable or in excess of the sizes of other classes certified within this Circuit. *See, e.g., Mullen*, 186 F.3d at 624 (noting that a class of 100 to 150 members satisfies the numerosity requirement). Furthermore, members of the settlement class are geographically dispersed, decreasing the practicability of joinder into one action. *See Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (noting the relevance to the numerosity requirement of "geographic dispersion" of the class). It is therefore clear that the settlement class created by the proposed settlement sufficiently satisfies the numerosity requirement.

### 2. Commonality

Commonality is met when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The test of commonality is "not demanding"; all that is required is that "there is one common question of law or fact." *James v. City of Dallas*,

11

254 F.3d 551, 570 (5th Cir. 2001).  "The interests and claims of the various plaintiffs need not be identical.  Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'"  *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1006 (5th Cir. 1993) (quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982)).  Here, all of the class members invested in Provident through Capital Financial, creating at least one major issue of fact in common with all class members.  Furthermore, the claims of the class members are replete with common questions of law that class members would have to prove in pursuing their claims, including whether Capital Financial as a broker-dealer can be held liable for the misrepresentations in the PPMs issued by Provident, whether the PPMs contained misrepresentations or omissions of material facts, and whether Capital Financial owed a fiduciary duty to class members.  Accordingly, the Court is convinced that the commonality requirement is met in this case.

### 3. Typicality

Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The test for typicality is "not demanding," and "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent."  *Mullen*, 186 F.3d at 625; *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997).  "Typicality does not require a complete identity of claims.  Rather, the critical inquiry is whether the class representative's claims have the same essential

characteristics as those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James*, 254 F.3d at 571 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed. 2000)). "The prerequisite in the settlement context requires 'proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement.'" *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 281 (W.D. Tex. 2007) (Biery, J.) (citation omitted).

The Representative Plaintiff asserts claims that arise out of Capital Financial's sale of Provident securities, and each class member's claims would involve proving similar facts about Capital Financial's actions in selling those securities and making statements or omissions concerning those securities. *See Longen v. Sunderman*, 123 F.R.D. 547, 557 (N.D. Tex. 1988) (Sanders, J.) ("The individual factual differences between the class representatives will not defeat class certification in this case where Plaintiffs have alleged a continuous course of conduct by defendants which is uniformly fraudulent and that they, as well as each member of the class, suffered a financial loss as a result of the . . . scheme."). Although certain of the class members may have dealt with different individuals associated with Capital Financial, these factual differences are not sufficient to overcome the similarity of the nature of the Representative Plaintiff's claims. The Representative Plaintiff has brought claims that are typical of the members of the Settlement Classes. Accordingly, the Representative Plaintiff's claims satisfy the typicality requirement.

### 4. Adequacy of Representation

"Rule 23(a)(4) is satisfied where: (1) the named plaintiffs' counsel will prosecute the action zealously and competently; (2) the named plaintiffs possess a sufficient level of knowledge about the litigation to be capable of taking an active role in and exerting control over the prosecution of the litigation; and (3) there are no conflicts of interest between the named plaintiffs and the absent class members." *Hamilton v. First Am. Title Ins. Co.*, 266 F.R.D. 153, 163-64 (N.D. Tex. 2010) (Fish, J.) (citing *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129 (5th Cir. 2005)).

Based on the information provided to the Court and the Court's involvement with counsel in this case, the adequacy of representation requirement is satisfied as to this proposed settlement. First, class counsel in this case and other counsel involved in the representation of class members in this matter, all of whom possess substantial experience in class action litigation, have zealously pursued the interests of class members as a whole. Second, the Representative Plaintiff, through a submitted statement and declaration, has provided to the Court sufficient indications that he will continue to take an active role in the prosecution of this class action and administration of this proposed settlement to its conclusion. The Court's observations throughout this litigation have also established that the Representative Plaintiff has and will exert control over the prosecution of the remainder of this litigation, should the settlement be approved, which would largely constitute administration of the settlement. Finally, the Court is satisfied that no conflict of interest exists between the Representative Plaintiff and absent class members, or involving class counsel, which represents plaintiffs in several cases related

14

to Provident before this Court. Here, considering the effort expended to achieve the contemplated recovery, the Court is convinced that "all class members are asserting [the] common right [of] achieving a maximum potential recovery for the class"; accordingly, "the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981); *see also McNamara v. Bre-X Minerals Ltd.*, 214 F.R.D. 424, 428-29 (E.D. Tex. 2002) (Folsom, J.) (finding that the adequacy of representation requirement was met when the named plaintiffs and class members all sought maximum recovery and where class counsel was skilled and experienced); *White v. Nat'l Football League*, 822 F. Supp. 1389, 1405 (D. Minn. 1993) (finding that class counsel's representation of various plaintiffs in related class action and individual lawsuits resulted in no conflict of interest and supported approval of class action settlement, citing class counsel's experience, the interrelationship of claims, and class counsel's role in facilitating the settlement).

***

Accordingly, the four requirements of Rule 23(a) are met for purposes of approval of this class action settlement.

### III. The Existence of a "Limited Fund" Under Rule 23(b)(1)(B)

Having determined that the proposed class action settlement satisfies the conditions of Rule 23(a), the Court now addresses whether a "limited fund" exists under Rule 23(b)(1)(B). The Court shall first discuss the concept of a "limited fund," and shall then assess whether the circumstances of this case allow for the approval of a "limited fund" settlement.

15

### A. The "Limited Fund" Concept

The concept of a "limited fund" settlement long predates the Federal Rule of Civil Procedure by which it is governed, Rule 23(b)(1)(B). This Rule provides, in relevant part, "A class action may be maintained if Rule 23(a) is satisfied and if . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." "Among the varieties of suit traditionally encompassed by Rule 23(b)(1)(B) are those involving a 'limited fund,' in which numerous individual claims against an insufficient fund would impair the ability of all members of the class to protect their interests." *Williams v. Nat'l Sec. Ins. Co.*, 237 F.R.D. 685, 692 (M.D. Ala. 2006) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999)).

The basic concept of a "limited fund" settlement is that there is a definite, limited amount of capital that is available to class members, and that such a fund is insufficient to cover all claims. The traditional "limited fund" situation typically involved multiple claims to a single, tangible fund, such as a bank account, trust, insurance policy, or proceeds from a sale of an asset. *See Ortiz*, 527 U.S. at 835-36; *see also* Robert G. Bone & David S. Evans, *Class Certification and the Substantive Merits*, 51 DUKE L.J. 1251, 1306 (2002); Arthur R. Miller, *An Overview of Federal Class Actions: Past, Present, and Future*, 4 JUST. SYS. J. 197, 211 (1978). In a traditional "limited fund" situation, the aggregation of the claims would be greater than the amount made available in this tangible fund. A court would subsequently have the ability to enforce a settlement that

16

provided for a pro rata distribution of the fund to all claimants, to ensure each claimant was treated fairly and equitably under the circumstances. *See Ortiz*, 527 U.S. at 834-36 (discussing *Dickinson v. Burnham*, 197 F.2d 973 (2d Cir. 1952)). As noted by the Supreme Court in *Ortiz*, the Advisory Committee involved in drafting the Federal Rules of Civil Procedure was aware of the precedent involving "limited fund" settlements, and accounted for previous use of the "limited fund" device by courts in providing commentary on Rule 23(b). *See id.* at 833-36, 841-42 ("The Advisory Committee, and presumably the Congress in approving subdivision (b)(1)(B), must have assumed that an action with these characteristics would satisfy the limited fund rationale cognizable under that subdivision."). This kind of class action necessarily provides for mandatory participation by class members because allowing class members to opt out of the class and pursue individual claims would deplete the fund to the detriment of other class members. *See* MARCY HOGAN GREER, A PRACTITIONER'S GUIDE TO CLASS ACTIONS 77 (American Bar Association Publication 2010) ("[Rule 23(b)(1)(B)] is typically used when, in the absence of a classwide remedy, claimants suing individually would be prejudiced by exhaustion of the limited fund."). Common features of a "limited fund" settlement thus include no opportunity for class members to opt out, and for the approving court to enjoin claims brought in other forums by individual class members that would deplete the fund if the individual class members managed to obtain an award from the defendant.

The Supreme Court's decision in *Ortiz* established the requirements for a "limited fund" under Rule 23(b)(1)(B).[6] The Supreme Court adopted the following three elements as presumptively necessary requirements to establishing a "limited fund" for a mandatory no opt-out class: (1) the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all claims; (2) the whole of the inadequate fund is to be devoted to the overwhelming claims; and (3) the claimants identified by a common theory of recovery are treated equitably among themselves. *Ortiz*, 527 U.S. at 838-39; *see also In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 193 (5th Cir. 2010). *Ortiz* thus held that "mandatory class treatment through representative actions on a limited fund theory was justified with reference to a 'fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." *Ortiz*, 527 U.S. at 841. The Supreme Court emphasized that it would be "essential" for the parties seeking the approval of a "limited fund" settlement to show that the fund is "limited independently of the

---

[6] Drawing upon cases that preceded the adoption of Rule 23(b)(1)(B), the Supreme Court described the traditional bounds of a mandatory "limited fund" settlement, and explained that its opinion sought to "keep[] limited fund practice under Rule 23(b)(1)(B) close to the practice preceding its adoption." *Ortiz*, 527 U.S. at 845. The Supreme Court therefore adopted a narrow interpretation of Rule 23(b)(1)(B). *Id.* at 838-41; *see also In re Simon II Litig.*, 407 F.3d 125, 137 (2d Cir. 2005) ("While neither the Rule itself, nor the Advisory Notes accompanying it, purports to delineate the outer limits of the Rule's application in the particular subset of 'limited fund' cases, the Supreme Court in *Ortiz* has read the 'limited fund' case as being moored to the Rule's historical antecedents . . . ."); *In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 877 (6th Cir. 2000) ("*Ortiz* confirmed that a literal reading of the Rule is inappropriate and that mandatory class treatment is to be confined to a narrow category of cases.").

agreement of the parties to the action." *Id.* at 864. The Supreme Court further noted that the purpose of the "limited fund" device is to ensure that the class's recovery is the "best possible arrangement" or the "best that can be provided for class members." *Id.* at 852, 860.

### B. Whether a "Limited Fund" Exists in this Case

The Court begins its analysis with the three "presumptively necessary" elements to satisfy approving a settlement through the "limited fund" rationale: (1) the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all claims; (2) the whole of the inadequate fund is to be devoted to the overwhelming claims; and (3) the claimants identified by a common theory of recovery are treated equitably among themselves. *Ortiz*, 527 U.S. at 838-39, 842; *Klein*, 2006 WL 325766 at *3.

There is little controversy concerning the second and third *Ortiz* factors, and the evidence before the Court indicates that these two factors have been satisfied. Regarding the second *Ortiz* factor, it is clear that the whole of the settlement fund will be devoted to paying claimants. Should the Court approve the settlement, the $1.52 million fund, minus costs and attorneys' fees, will be distributed to all class members who have claims against Capital Financial regarding its sale of Provident securities.

The third *Ortiz* requirement of whether the claimants are treated equitably among themselves is also satisfied in this case because the settlement fund will be distributed to class members on a *pro rata* basis. The Court finds this third factor to be particularly important to its decision in this case. Were the Court not to approve this settlement, it is

19

extremely likely that a very small fraction of class members would have their arbitration claims heard before the fund is depleted. It may even be that none of the claimants receive any award at all due to losing at arbitration, but the fund would be expended anyway because of Capital Financial's attorneys' fees. If any were to recover at all, the fund would be depleted long before every arbitration claimant, not to mention other class members, were to receive an opportunity for compensation. A key feature of the "limited fund" device is the "equitable principles underlying the *pro rata* distribution," *In re The Reserve Fund Secs. & Derivatives Litig.*, 673 F. Supp. 2d 182, 204 (S.D.N.Y. 2009), and this case demonstrates a situation where consideration of those equitable principles is particularly appropriate. In this situation, an arbitrator "could grant relief to an individual claimant and siphon assets away from the res without regard to any equitable concerns, thereby undermining the *pro rata* distribution this Court has deemed necessary to treat all claimants fairly and equitably." *Reserve Fund*, 673 F. Supp. 2d at 204. The terms of this proposed settlement, including the enjoining of arbitrations that could result in individual rewards disproportionate to other class members, reflect the Court's equitable concern for ensuring a fair recovery for all class members. *See S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (holding that district court acted within its discretion when it equitably distributed remaining assets of an entity on a *pro rata* basis). While the Court must still assess the propriety of approving the settlement in light of the crucial first *Ortiz* factor, the principles of equity that are embodied in the "limited fund" doctrine are particularly pertinent to the Court's ultimate decision.

The Court thus focuses its attention on the first *Ortiz* factor of whether the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all claims. The Court must first consider whether the Representative Plaintiff has demonstrated the total liquidated amount of the claims and the total amount of the purported "limited fund." Many courts have been reluctant to utilize the "limited fund" device when the claimants have claims for unknown and unliquidated amounts of damages. *See Ortiz*, 527 U.S. at 850; *Katrina*, 628 F.3d at 193-94 (rejecting a proposed "limited fund" settlement when "[t]he class members in this case suffered a wide variety of injuries, ranging from property damage to personal injury and death, and no method is specified for how these different claimants will be treated vis-à-vis each other"); *Klein*, 2006 WL 325766 at *4-*5 (holding that first *Ortiz* requirement not met in products liability claim relating to intravenous pharmaceutical product when the figures related to damages were estimated).

However, unlike what has been seen in mass tort cases such as *Katrina* or *Klein*, the amount of losses in this case is known and ascertainable, as each class member can easily determine the amount of his or her investment that was lost as a result of the collapse of Provident. *See Klein*, 2006 WL 325766 at *4 (in proposed "limited fund" settlement of mass tort claims, rejecting first element because "plaintiffs' estimate of potential claim liability does not provide the court with any comfortable certainty of the total value of the claims"). The evidence presented to the Court demonstrates that the total amount of losses that class members seek to recover this case adds up to over

21

$65 million, and because of the nature of the losses in this case, the Court can rest assured that the amount contemplated is a "sufficiently reliable conclusion regarding the probable total of the aggregated liquid damages." *Id.* at *5. Unlike in mass tort cases, the damages here are known to each class member based on the losses they suffered through their investments in Provident securities. Indeed, the damages in this case, which can be clearly calculated because each claimant has a concrete amount of losses arising from the purchase of Provident securities through Capital Financial, are amenable to determining the total liquidated amount of the claims for purposes of a "limited fund" settlement. Accordingly, this feature of a proper "limited fund" is satisfied in this case.

The Court next considers whether the "amount of funds available to satisfy the claims" is set definitively at its maximum. *Ortiz*, 527 U.S. at 838-39. The proposed settlement fund itself consists of $1,520,000, consisting of $1,400,000 remaining in insurance coverage and a $120,000 contribution directly from Capital Financial, which is the absolute maximum amount that FINRA has determined Capital Financial can contribute while maintaining the amount of assets necessary to maintain operations. It is clear that this sum is inadequate to pay all claims, and the Court is convinced that the fund is not "postulated" or "not easily susceptible to proof, definition, or . . . estimation." *In re Simon II Litig.*, 407 F.3d 125, 138 (2d Cir. 2005). Instead, there is a clear amount that has been designated by the remaining amount within the insurance fund and amount that FINRA has determined that Capital Financial can contribute to the settlement without violating SEC regulations. Accordingly, it is clear that the total settlement fund,

like the total amount of damages, is clearly ascertained, and, if approved, is an appropriate concrete number for purposes of a "limited fund" settlement.

However, the Court must still determine whether this proposed settlement meets the requirement of *Ortiz* that the "limited fund" be "set definitively at [its] maximum[]." *Ortiz*, 527 U.S. at 838. Indeed, one of the most pressing issues before the Court is whether this sum, consisting of the insurance proceeds and the amount provided to FINRA, can be considered a "limited fund," when Capital Financial will remain in business and functioning if this settlement is approved, and will therefore maintain certain assets required for its continued operation that will not go to class members. In attempting to gain approval for a "limited fund" settlement, "the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund." *Ortiz*, 527 U.S. at 849. The parties have submitted clear evidence as to the two sources of the fund: the remaining insurance benefits, which have been preserved through the Court's temporarily enjoining arbitration claims against Capital Financial, or $1.4 million, and the $120,000 approved for inclusion in the settlement fund by FINRA.

The Court first addresses whether the $1.4 million amount is the maximum amount of insurance benefits available to satisfy claims against Capital Financial related to the sale of Provident securities for the purposes of the first *Ortiz* factor. Certain objectors, including Jac and Judith Slominski, argue that a larger $5 million aggregate policy, rather than a $2 million sublimit, applies to the Provident claims against Capital

23

Financial. Arch has taken the position that the claims asserted by class members are "related," and refers to the relevant provision of its policy, which states:

> Related Claims means all Claims, whether made against more than one Insured or by more than one claimant, arising out of a single Wrongful Act or a series of Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

Supp. App., *Billitteri* Docket No. 170-14, at 137 (emphasis omitted). The policy further provides that "All Related Claims shall be deemed a single Claim . . . ." *Id.* at 141 (emphasis omitted). Arch thus asserts that the $2 million sublimit concerning "Related Claims" applies to claims against Capital Financial arising out of its sale of Provident securities to class members, rather than the $5 million aggregate limit.

The Court does not presume to rule, absent full litigation of this issue, that the Arch is correct in this assertion. However, the Court is of the opinion that the "limited fund" in this case can properly be based upon the $2 million sublimit. First, other portions of the $5 million aggregate insurance policy are being considered in regard to Capital Financial's sale of Medical Capital and other securities that were related to the Provident Ponzi scheme. Much of the litigation involving these other claims that are the subject of the policy has been consolidated before this Court, and the Court is well aware of the need for other portions of the policy to be devoted to claims arising from the sale of Medical Capital and other related securities, much as FINRA was aware of the need to devote $120,000 of Capital Financial's $200,000 contribution to this proposed settlement and reserve the other $80,000 to addressing claims arising from Capital Financial's sale of Medical Capital.

24

Second, the Court is convinced that the settling parties' reliance upon the $2 million sublimit was appropriate for purposes of this proposed settlement. In *Ortiz*, the Supreme Court noted that "value discounted by risk" could possibly be taken into account in assessing whether a "limited fund" based upon applicable insurance coverage existed. *Ortiz*, 527 U.S. at 851. In this case, based on its assessment of the insurance policy, the Court's own experience in this litigation, and the interests of the class members in getting at least some recovery in a short amount of time, the Court is of the opinion that the circumstances allow for such an approach. Having reviewed the insurance policy, the Court is of the opinion that Arch would have a substantial chance of success in confirming its position through litigation, and the Court does not believe that the settling parties' reliance upon the sublimit in submitting this "limited fund" settlement to the Court for consideration was inconsistent with the "limited fund" doctrine. The Court's experience in this litigation has made it well aware of the time and expense it would take to litigate this issue, and how rejection of this proposed settlement on this ground could significantly delay recovery by class members. For example, litigation on a similar insurance coverage issue in relation to Arch's coverage of another defendant in the *Billitteri* case, NEXT Financial Group, Inc., entitled *NEXT Financial Group Inc. v. Arch Specialty Insurance Company*, 3:10-cv-2206-F, took ten months to reach a resolution and underwent substantial motion practice. Furthermore, as noted above, the insurance policy at issue is a "wasting" policy, and the cost of additional litigation regarding this question would be deducted from the fund itself. Thus, in addition to the delay, class members' recovery would very likely be reduced even further by the cost of

25

litigating the issue, while a successful outcome in such litigation that has the possibility of making up for such losses is far from certain.

For these reasons, taking into account the facts surrounding the Arch policy and the best interests of the class, as the Court is required to do under *Ortiz*, this objection by the Slominskis is overruled. Accordingly, the $1.4 million remaining of the assets within the $2 million Arch insurance subpolicy is a proper amount set at its maximum for purposes of the first *Ortiz* factor.

The Court now focuses on the evidence of whether the latter portion of the fund, namely the direct contribution from Capital Financial, is set definitively at its maximum. As with all decisions regarding class certification, the Court takes a "'close look' at the parties' claims and evidence in making its Rule 23 decision." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (citing *Amchem*, 521 U.S. at 615).

At the initial fairness hearing and in subsequent filings, the Court was presented with evidence of Capital Financial's financial condition and available assets, including quarterly FOCUS reports mandated by FINRA dating back several years that detail Capital Financial's assets, surplus, and other financial features. As demonstrated at the Court's hearing on January 11, 2011, the evidence and testimony presented to the Court shows that Capital Financial's net capital requirements are barely met after the FINRA-mandated amount is deducted from Capital Financial's net capital. The $200,000 contribution, when the excess net capital was at around $266,000, would indeed leave Capital Financial barely able to meet regulatory requirements. Based on the Court's assessment of the evidence, the Court is convinced that FINRA's assessment should not

26

be doubted, and that $120,000 is all that can be contributed to this settlement without putting Capital Financial in imminent danger of potential regulatory violations and insolvency.

The remaining objections to the settlement by Christine Meengs and Terry and Carolyn Stanfield argue that the use of the excess net capital figure in determining the "limited fund" is inappropriate, and argues that any "limited fund" settlement should include the overall net worth of Capital Financial. *See* Stanfield Objection, *Billitteri* Docket No. 255, at 1-2; Meengs Objection, *Billitteri* Docket No. 262, at 1-2 ("Without considering all of Capital Financial's assets, the Class Plaintiffs have failed to show that this is an adequate settlement."). In support of this argument, the Stanfields and Meengs note that *Ortiz* rejected a "limited fund" settlement that did not include all of a defendant's assets and where the district court had not made a finding of the defendant's net worth, noting that such an arrangement was not the best that could be obtained for class members. *Id.* (citing *Ortiz*, 527 U.S. at 850, 860). The Stanfields and Meengs ask that the Court reject this proposed settlement, citing one district court's conclusion the "[n]et capital does not equate to net worth" for the purpose of a "limited fund" settlement. *Cooper v. Miller Johnson Steichen Kinnard, Inc.*, No. 02-1236 (RHK/AJB), 2003 WL 1944169, at *4 (D. Minn. Apr. 21, 2003).

While the Court takes the Stanfields' and Meengs's argument into account, the Court is convinced that the circumstances in this case and Fifth Circuit precedent permit the finding of a proper "limited fund" under Rule 23(b)(1)(B). The source of the $120,000 amount contributed by Capital Financial comes from FINRA's determination

27

that such an amount was the maximum that could be contributed to a settlement of Provident claims without forcing Capital Financial into a violation of SEC regulations and potentially shutting down its operations. Throughout the settlement approval process, certain objectors have argued that this amount cannot support a "limited fund" settlement because Capital Financial remains in possession of certain assets to continue operations, and that Capital Financial must contribute all of its assets to the settlement fund. However, the Court is of the opinion that the fact that Capital Financial will maintain limited assets to continue operations does not preclude the Court from approving this settlement. Indeed, courts have approved "limited fund" settlements that do not encompass a company's entire net worth. For example, in *Williams v. National Security Insurance Co.*, 237 F.R.D. 685 (M.D. Ala. 2006), two plaintiffs sued National Security Insurance Company ("NSIC"), alleging that NSIC had discriminated against African-American policy-holders by charging higher premiums to them than the premiums charged to white policy-holders. *Id.* at 687. The plaintiffs represented a class of over 1,000 members, with 174 of them pursuing individual claims against NSIC through individual lawsuits. *Id.* at 692. The parties to the *Williams* case sought the court's approval of a "limited fund" settlement that would enjoin all claims by class members that would increase class members' benefits, and decrease NSIC's surplus capital by approximately 35%. *Id.* This "limited fund" settlement would thus allow NSIC to continue operations and maintain some of its assets while releasing it from liability.

28

In approving the settlement under Rule 23(b)(1)(B), the Court cited the statements

of the deputy commissioner of the Alabama Department of Insurance ("ALDOI"), which

regulated NSIC's solvency:

> One of the obvious signs which concern regulators from the standpoint of solvency is a large reduction in surplus. The subject proposed settlement involves as cost to NSIC of in excess of 30% of its surplus. In the context of solvency regulation, this cost is very large in relation to the surplus of NSIC and is a matter for concern. The cost of this settlement is definitely material to the solvency of NSIC but does not require that it be placed under supervision. A further material negative development could well affect its surplus, its financial viability and its ability to continue in business, not to mention the performance of its obligations under the subject proposed settlement . . . ALDOI considers the non opt-out feature of this settlement to be essential because the cost of defense of numerous individual cases or the imposition of a large verdict, could require that ALDOI place this company under supervision or in receivership.

*Id.* at 693. ALDOI did not assess additional sanctions against NSIC "precisely because

of concerns over the company's continuing solvency":

> Both the direct and indirect costs to [NSIC] of the implementation of the measures called for by the Stipulation will be substantial. Any additional sanctions imposed by the Department against NSIC would not be in the best interests of NSIC, its current or former policyholders, the consumers of this state, or the state of Alabama.

*Id.* The district court approved the settlement, citing the risk of the prosecution and

adjudication of individual claims as threatening the interests of the class and taking

ALDOI's concerns and recommendations into account. *Id.*

The Court is faced with a similar situation in this case. The $120,000 amount that

Capital Financial is directly contributing to the settlement is not some arbitrary number

that was randomly chosen, but was determined by FINRA as the maximum that Capital

Financial could contribute without violating the requirements for capital on hand

established by the SEC, which regulates Capital Financial. Here, similar to *Williams*, the Court is faced with a situation where the input of a regulating body has established the source and the appropriateness of the creation of the "limited fund." The Court is thus satisfied that the $120,000 portion was "limited independently of the agreement of the parties to the action." *Ortiz*, 527 U.S. at 864. While the situation is not exactly like *Williams*, this case presents similar concerns: FINRA, whose representative, Marshall Gandy, was present at one of the January hearings and supported the Court's procedures in dealing with this settlement, has not only determined that a settlement of this type would allow Capital Financial to remain in regulatory compliance, but has actually determined the maximum amount that it could contribute to such a settlement without being forced into regulatory violations.[7] Furthermore, the Court takes into account the fact that the *Williams* decision considered regulatory interests, preserved the rights of the settling defendant to continue operations in light of the Rule 23(b)(1)(B) settlement, and approved of the settlement without including every asset that the settling defendant possessed, instead relying on regulatory requirements. As in *Williams*, approving this

---

[7] While not raised by the parties, the Court does note that failure to approve this settlement would almost certainly result in Capital Financial's bankruptcy or intervention of FINRA regulators. This action would certainly force FINRA, a bankruptcy court, and others to invest substantial time and public resources in liquidating or overseeing Capital Financial, and would certainly delay any recovery by class members. While this is not directly relevant to the issues raised under Rule 23(b)(1)(B), the costs to the public that would result from not approving this settlement which would be substantial. *See Williams*, 237 F.R.D. at 693 (noting ALDOI's contention that failing to approve the "limited fund" settlement before the district court "could require that ALDOI place [the defendant] under supervision or in receivership"). This does not, of course, weigh in favor of or against approval of the settlement, but the Court is well aware of the implications of this settlement beyond the members of the class.

settlement, in addition to satisfying equitable concerns, favors the interests of the class members and the entity performing regulatory oversight. *Williams*, 237 F.R.D. at 693. *Williams* thus supports approval of this proposed "limited fund" settlement.

In support of its conclusion that the Court may certify a Rule 23(b)(1)(B) settlement class without including all of Capital Financial's assets, the Court also notes the Fifth Circuit's decision in *Baker v. Washington Mutual Finance Group, LLC*, 193 Fed. Appx. 294 (5th Cir. 2006).[8] In *Baker*, a class plaintiff attempted to certify a settlement class in which punitive damages claims would be resolved in a no-opt-out "limited fund" format under Rule 23(b)(1)(B). *Id.* at 296-97. This "limited fund" was established at $3.5 million. *Id.* at 296. The district court approved the settlement, and certain objectors appealed, arguing that Washington Mutual's worth was actually between $50 and $70 million, and that the upper limit of the fund was inadequate in light of this assertion. *Id.* at 297.

The Fifth Circuit held that the district court did not abuse its discretion in approving the "limited fund" settlement. The Fifth Circuit noted that the district court had taken into consideration the fact that Washington Mutual had ceased operations in Mississippi and, if an award were finally approved by the Mississippi Supreme Court in a different case against Washington Mutual, "Washington Mutual's net worth will be greatly diminished and perhaps completely eradicated." *Id.* at 298. The Fifth Circuit

---

[8] While *Baker* is an unpublished decision, and is therefore not binding upon this Court, *see* 5th Cir. R. 47.5, the Court nonetheless finds it persuasive and applicable to this situation. *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 197 n.33 (5th Cir. 2011) (noting an unpublished decision's nonbinding nature but "find[ing] its reasoning persuasive").

noted that the district court "went on to explain that the $3.5 million figure was not simply 'plucked out of thin air,'" as the objectors contended.  *Id.*  The Fifth Circuit further wrote:

> In addition, the district court found that if the class is not certified it is likely that tends of thousands of individual lawsuits will ensure.  After considering the breathtaking cost of defendant against so many individual lawsuits, the district court determined that $3.5 million was the most that Washington Mutual would be able to pay as punitive damages.

*Id.*  The Fifth Circuit thus held that it "[could not] deem the district court's factual determination that $3.5 million was the upper limit an abuse of discretion."  *Id.*

The Court finds *Baker* instructive in this case.  In *Baker*, the district court took all of the circumstances surrounding the settling defendant's financial condition into account in determining that approving a $3.5 million settlement fund would be a proper exercise of the "limited fund" device, and the Fifth Circuit approved this action as within the district court's discretion.   In this case, the Court similarly finds, after an intensive inquiry of the financial condition of Capital Financial and its registered representatives, which has included going through two fairness hearings, hearing substantial testimony, and reviewing dozens of financial reports, that approval of a "limited fund" of containing a $120,000 direct contribution from Capital Financial in addition to the $1.4 million remaining of the insurance policy is appropriate.  As in *Baker*, Capital Financial will be forced with defending arbitrations and other proceedings by individual claimants at "breathtaking cost," *id.*, and the Court is convinced that this situation compels a similar result.  Furthermore, it is clear that the $120,000 figure was not "plucked out of thin air." While the figure in *Baker* was approved in consideration of the defendant's

circumstances, the $120,000 figure is based specifically on a determination by a regulating body of the amount that could be contributed without causing the collapse of Capital Financial. The figure in this case thus does not even contain the hint of arbitrariness of the figure that was ultimately approved in *Baker*. *See also In re Telectronics Pacing Systems, Inc.*, 221 F.3d 870, 880 (6th Cir. 2000) (reversing the district court's approval of a "limited fund" settlement in which a defendant contributed $10 million because the district court "did not undertake an independent risk analysis, but instead accepted the $10 million settlement figure as representing the maximum amount the Australian defendants could be required to pay claimants," and calling such an action "plainly improper").

It is true that the district court in *Cooper* did not approve a "limited fund" settlement based upon a company's net capital rather than its net worth. *See Cooper*, 2003 WL 1955169 at *4. However, in addition to the fact that *Cooper* is not binding upon this Court, the Court is of the opinion that *Baker* and *Williams* are more applicable to this situation, and permit approval of a settlement that does not include the company's entire net worth or require the finding of the company's net worth. Instead, the district courts in *Baker* and *Williams* took into account the reality of the situation with the defendant companies at issue in those cases, and approved "limited fund" settlements that did not include a finding of the company's net worth or a settlement fund that included the company's entire net worth. In *Baker*, the Fifth Circuit affirmed the district court's approval of a "limited fund" settlement that included far less than the defendant's apparent net worth when a vast majority of the defendant's assets were on the verge of

33

being depleted by the imminent approval of a judgment by another court and the specter of individual actions in light of these circumstances threatened to leave all class members with no recovery. *Baker*, 193 Fed. Appx. at 298. In *Williams*, the district court approved a "limited fund" settlement when many individual actions would have disposed of the interests of members of the class as a whole, and when the relevant regulatory agency endorsed the settlement as in the public interest. *Williams*, 237 F.R.D. at 692-93. Both of these cases allowed for a "limited fund" settlement that preserved some of the assets and the operational capacity of the defendant, but where a searching court inquiry and the interests of the class as a whole would be served by approval of the settlement. *Baker* and *Williams* support approving a "limited fund" settlement that does not cause the settling defendant's insolvency by carefully considering all of the facts surrounding a company's financial condition and considering the Court's goal of ensuring "the fair and equitable treatment of all claimants." *Reserve Fund*, 673 F. Supp. 2d at 204. This case compels a similar result.

Accordingly, the Court does not consider a total deprivation of Capital Financial's assets a requirement to approving this "limited fund" settlement. *See Williams*, 237 F.R.D. at 692-93 (approving a "limited fund" settlement that, in the opinion of state regulators, reflected "both fairness to the class and [the settling defendant's] continuing solvency").[9] The Court is convinced that, when taking the equitable interests of class

---

[9] The Court notes that, in support of applying a "limited fund" theory, the district court in *Holmes v. Trustmark Nat'l Bank*, No. CIV.A. 195-CV-323 GR,

members into account, the composition of the settlement fund in this case is a proper use of the "limited fund" doctrine. This is not to say that approval of a "limited fund" settlement without including all of a defendant's assets is appropriate in every situation; instead, the Court comes to this conclusion in this particular case, taking the best interests of the class members into account, as instructed by *Ortiz*, and approving of a settlement that realistically provides the best possible result for the class as a whole. In this case, as in *Baker* and *Williams*, after a full assessment of the facts and the potential recovery for class members, the Court is of the opinion that approving the "limited fund" settlement truly is "the best that can be provided for class members" under these circumstances, and should be approved. *Ortiz*, 527 U.S. at 860.[10]

A second issue that the Court must address is the fact that the assets of Capital Financial's individual registered representatives against whom claims are asserted by

---

1996 WL 904513, at *2 (S.D. Miss. Jan. 11, 1996), cited *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1334 (5th Cir. 1995), for the proposition that "multiple awards of exemplary damages in class action suits . . . should not be so oppressive that they amount to destruction of the wrongdoers." *Holmes*, 1996 WL 904513 at *2. While the Court acknowledges that *Allen* was discussing punitive damages, which are not at issue here, the Court reads and applies *Allen* as *Holmes* did, supporting a "limited fund" theory when, as here, individual adjudications would entirely deplete the fund, leave Capital Financial out of business, and provide many class members with no ability to recover whatsoever.

[10] The Court further notes that this settlement does not necessarily mean that class members have no other sources of recovery. Although Capital Financial will remain in operation, this settlement does not release the parent company, Capital Holdings, from liability. Indeed, Capital Holdings remains a defendant in the original *Billitteri* action, and recent filings indicate that settlement discussions regarding Capital Holdings took place in May of 2011 and are continuing as this litigation proceeds. Furthermore, this settlement does not release from liability those individual registered representatives who have not submitted their financial information to the Court for review. *See* Appendix A to this Order.

individual class members, are not included in the settlement, and yet claims against them will be released.  Certain individual class members have included these individuals as defendants in their arbitration claims against Capital Financial, asserting that they were themselves liable for their role in the sale of Provident securities.  Certain objectors, particularly the Campen Intervenors, strongly argued that a "limited fund" settlement could not be approved if these individuals would be released from liability and the assets of these individuals would not be included within the "limited fund."  Although the Campen Intervenors have since withdrawn their objection to the settlement, the Stanfields and Meengs also briefly mention this argument without elaboration in their objections to the settlement, which remain pending.  Jac and Judith Slominski also raise this argument in their letter of February 24, 2011.

Class counsel contends that pursuing these individual registered representatives would be a more costly endeavor than the amount of assets that they could recover from them.  However, class counsel took into account the Court's concerns about this element at the first fairness hearing, and undertook an effort to provide the Court with the financial information of these individuals to support their assertion.  *See Stott* Docket No. 23.  After the fairness hearing, the terms of the proposed settlement were altered so that registered representatives who provided their financial information to the Court for review could be included in the release from liability.  Many directors, officers, and registered representatives of Capital Financial, who are listed in Appendix A to this Order, submitted their financial information as part of this arrangement.  *See id.*

Although the assets of the released individuals will not be included in the settlement, the Court is of the opinion that approval of the settlement is still a proper application of the "limited fund" doctrine. The Court has extensively reviewed the financial information of the individual registered representatives that have submitted such information to the Court, and the Court is inclined to agree with class counsel that pursuing claims against these individuals would incur substantial expense for very little in terms of assets that could be recovered, and that pursuing the claims against indemnification defenses by the registered representatives would be exceedingly difficult and costly. *See Newby v. Enron Corp.*, 394 F.3d 296, 309 (5th Cir. 2004) (holding that a district court was justified in strongly weighing the opinion of class counsel against that of objecting class members "in light of their superior sophistication"); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (in evaluating a class action settlement, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties"). Notably, at least one court has not let the release of claims against individuals prevent approval of a "limited fund" settlement against their employer. *See Reserve Fund*, 673 F. Supp. 2d at 202-03 (approving a "limited fund" settlement that enjoined claims against the settling defendant's "officers, directors, trustees, representatives, against or employees to the extent that such claims are subject to indemnification"). In light of the Court's assessment of the evidence submitted to the Court, which included a searching review of the information painstakingly collected by class counsel and submitted to the Court, the Court is of the opinion that the release of the individual registered representatives who have submitted financial information for the Court's review without

contributing to the "limited fund" should not prevent approval. *See Ortiz*, 527 U.S. at 851 (while noting that application of such an analysis was "a step removed from the historical model," leaving open the possibility that taking into account "limit as a value discounted by risk" of continuing litigation could be considered by courts in assessing a proposed "limited fund"). While these individuals have not contributed to the settlement, the Court is of the opinion that the procedures and requirements undertaken by the Court have provided sufficient protection to class members and justification for releasing claims against individual registered representatives, directors, and officers.[11]

\*\*\*

Accordingly, the Court concludes that the "limited fund" model applies to this situation, and that the Court may approve this settlement under Rule 23(b)(1)(B). Although this "limited fund" settlement involves a number of elements that require intensive analysis of the facts surrounding the case, the Court is of the opinion that prior

---

[11] The Court also notes that, although the Campen Intervenors have since withdrawn their objection to approval of this settlement, this argument about releasing claims against individual registered representatives was the basis of Donald and Marva Latimer's objection to preliminary approval of the settlement, filed on January 11, 2011. Opposition, *Billitteri* Docket No. 185, at 1. The Latimers did not object to settling with Capital Financial, but wished to pursue their claims against the two individual registered representatives who sold Provident securities to them, John Harper and Michael Boyer. Harper and Boyer did not submit their financial information to the Court, and thus are not released by the settlement. Accordingly, because the Latimers may still pursue claims against Harper and Boyer, their objection does not apply to the terms of this settlement, and it does not stand in the way of the Court's approval of the settlement. Notably, however, Jac and Judith Slominski's letter of February 24, 2011 objects to the enjoining of their claims against Larry Bakken, a former Capital Financial registered representative who is released by the terms of this settlement. However, as noted above, the Court is of the opinion that this objection should not prevent approval of the settlement, and is therefore overruled.

case law, including *Baker* and *Williams*, support approval of this settlement, which in the opinion of the Court is in "the best that can be provided for class members." *Ortiz*, 527 U.S. at 860.   Approval is especially appropriate in light of the aforementioned equitable considerations related to the class members themselves, who, without this proposed settlement, would very likely be subject to an unfair distribution of the remaining funds or no recovery at all.  *See* GREER at 77 (noting that the use of the "limited fund" device is appropriately used when "claimants suing individually would be prejudiced by exhaustion of the limited fund").  The objections to the fund based on the applicability of Rule 23(b)(1)(B), including those of the Bensons, the Slominskis, Meengs, and the Stanfields are accordingly overruled.  However, while the characteristics of the "limited fund" are appropriate for approval in this case, the Court must still address whether it has the authority to enjoin arbitrations brought by individual class members, which it shall do in the next section of this Order.

## IV. The Court's Authority to Enjoin Arbitrations

Having determined that a "limited fund" exists in this case, the Court must now assess whether it has the authority to permanently enjoin arbitrations brought by individual class members against Capital Financial and its officers, directors, and brokers. As noted in the previous section, the nature of a Rule 23(b)(1)(B) "limited fund" class action settlement inherently limits other actions by class members because the purpose of the device is to preserve the "limited fund" for equitable distribution to members of the class.   Accordingly, as part of approving this settlement, the Court would have to

permanently enjoin all claims brought by individual class members against the settling defendant.

Unlike other more common types of settlements under Rule 23(b)(3), a "limited fund" settlement does not permit class members to opt out. *See Ortiz*, 527 U.S. at 838 (noting that a settlement meeting the conditions of a "limited fund" is one from which "no one has the right to secede"). To do so could jeopardize the "limited fund" because separate adjudications pertaining to individual class members could deplete the fund, disrupt the terms of the settlement, and cause an inequitable recovery. *See In re Joint Eastern & Southern Dist. Asbestos Litig. (JESDAL)*, 134 F.R.D. 32, 36-38 (E.D.N.Y. 1990) (citing depletion of the funds available to pay into a "limited fund" settlement as a justification for enjoining pending litigation around the country); *accord Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2007 WL 5010298, at *3 (C.D. Cal. Nov. 28, 2007). Accordingly, "limited fund" settlements often involve enjoining other legal proceedings to preserve the limited assets that would available to all class members. *See, e.g., Lloyd v. Cabell Huntington Hosp., Inc.*, 58 F. Supp. 2d 694, 696 (S.D. W. Va. 1999); *Holmes v. Trustmark Nat'l Bank*, No. CIV.A. 195-CV-323 GR, 1996 WL 904513, at *2 (S.D. Miss. Jan. 11, 1996) (holding that "in class-action cases involving a limited fund and multiple litigants, the Court is clearly empowered to stay pending state proceedings for purposes of exercising jurisdiction over the class action"); *see also Fecht v. Makowski*, 406 F.2d 721, 723 (5th Cir. 1969) (in the context of a "limited fund" situation in maritime actions, noting that "[t]he reason for enjoining state court suits is to distribute effectively a limited fund in a single proceeding").

This particular "limited fund" settlement has a unique aspect that requires the Court's careful consideration. Rather than enjoining litigation brought by individual class members, the claims raised by individual class members have been brought in arbitration under the auspices of FINRA, as provided by their contracts with Capital Financial. As part of its approval of this proposed settlement, the Court would have to enjoin these arbitrations. Such an action would require the Court to utilize its authority under the All Writs Act, and would implicate rights guaranteed by contract, statute, and the Constitution. The class members who have pursued arbitration clearly have a substantive contractual right to arbitration, which is protected by the statutory provisions of the Federal Arbitration Act[12] and the strong federal policy within the court system in favor of arbitration. *E.g. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Jones v. Halliburton Co.*, 583 F.3d 228, 235 (5th Cir. 2009). Additionally, this proposed settlement would abridge the due process rights of individual class members because they will be unable to either opt out of the settlement or further

---

[12] The arbitrations initiated by individual class members against Capital Financial and certain of its registered representatives were provided for in the individual class members' contracts. The Federal Arbitration Act provides in relevant part,

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. § 3. This case does not involve referring any issues before the Court to arbitration, but staying arbitrations that have already commenced.

pursue their claims through arbitration. The Rules Enabling Act provides that the Federal Rules of Civil Procedure "shall not abridge, enlarge, or modify any substantive right." *Ortiz*, 527 U.S. at 845 (quoting 28 U.S.C. § 2072(b)); *see also Amchem*, 521 U.S. at 613. Because this proposed settlement abridges the individual investors' contractual and due process right to pursue their claims through arbitration, there is a question as to whether the Court should utilize Rule 23(b)(1)(B) to approve a "limited fund" settlement that abridges this substantive right.

The Court's authority to enjoin competing litigation stems from the All Writs Act. The All Writs Act provides, "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The Fifth Circuit has instructed that the All Writs Act should be construed narrowly and applied "only under 'such extraordinary circumstances . . . that indisputably *demand* such a course of action as absolutely necessary to vouchsafe the central integrity of the federal court judgment.'" *Singh v. Duane Morris LLP*, 538 F.3d 334, 341 (5th Cir. 2008) (quoting *Texas v. Real Parties in Interest*, 259 F.3d 387, 395 (5th Cir. 2001)).

In approving a "limited fund" settlement, courts are frequently forced to enjoin competing litigation in order to preserve the "limited fund" utilizing their authority under the All Writs Act. *See Holmes*, 1996 WL 904513, at *2; *JESDAL*, 134 F.R.D. at 37 ("The All-Writs Act furnishes additional authority to certify a class action and to stay all pending proceedings."); *Mycka v. Celotex Corp.*, Civ. A. No. 87-2633, 1988 WL 80042, at *4 (D.D.C. July 18, 1988) (in approving "limited fund" class action settlement,

"exercis[ing] its jurisdiction under the All Writs Act . . . and expressly prohibit[ing] any person from prosecuting any presently pending individual actions or from commencing any new actions against [the settling defendant] seeking recovery for personal injuries," applying such an action to "proceedings pending in both the federal and state courts"). Because use of the "limited fund" device is appropriate when a recovery by one class member "cannot be made without affecting the proportionate interests of other class members similarly situated," GREER at 77 (citation omitted), a court's enjoining of competing procedures is generally necessary to ensure that the "limited fund" is not depleted and that all class members are treated fairly. *Reserve Fund*, 673 F. Supp. 2d at 204.

It is thus clear that federal courts have the power under the All Writs Act to enjoin competing litigation to preserve its jurisdiction over a class action settlement before it, particularly when faced with a "limited fund" situation. *See Liles v. Del Campo*, 350 F.3d 742, 746 (8th Cir. 2003) ("Injunctions of related proceedings in other federal courts are appropriate when necessary for adjudication or settlement of a case."); *In re Baldwin-United Corp.*, 770 F.2d 328, 335 (2d Cir. 1985) ("Even before a federal judgment is reached, . . . the preservation of the federal court's jurisdiction or authority over an ongoing matter may justify an injunction against actions in state court."); *Reserve Fund*, 673 F. Supp. 2d at 204 (issuing an injunction of individual class members' litigation under the All Writs Act when "dealing with a limited res that is likely to be dissipated absent an injunction"); *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 697 (D. Colo. 2006) ("The Court . . . finds it appropriate to preliminarily enjoin members of the

[settlement classes] from asserting or pursuing any of the claims to be released pursuant to this settlement in either state or federal court, as numerous other courts have done in connection with preliminary approval of proposed class action settlement.").[13]  In *Liles*, the Eighth Circuit explained the benefits of enjoining other proceedings when a "limited fund" exists:

> The district court enjoined proceedings in related litigation to preserve the settlement fund, to eliminate the risk of inconsistent or varying adjudications that would deplete the fund, to avoid confusion among the class members, and to save scarce judicial resources.  The court acted within its discretion in issuing the injunction because enjoining related litigation was necessary to ensure the enforceability of the order approving the preliminary settlement and to prevent further draining of the limited settlement fund.  As the district court found, neither settlement nor notification of class members could be achieved if the settlement fund were eaten up by litigation in other courts.  Without enjoining related litigation, the court ran the risk of undermining the settlement that had been negotiated and preliminarily approved and of exhausting the only asset available for class recovery.  We conclude that the court did not abuse its discretion in enjoining related litigation.

*Liles*, 350 F.3d at 746-47.

---

[13] This authority allows the Court to enjoin competing litigation brought by the Provident Royalties Liquidating Trustee, Milo Segner, against Capital Financial in a related case before this Court, *Segner v. Securities America, Inc.*, 3:10-cv-1884-F, which was originally brought in Bankruptcy Court before the reference was withdrawn on November 23, 2010.  Although the Liquidating Trustee is not a party to this action, he is asserting claims that were assigned by members of the settlement class, and the Court has the authority under the All Writs Act to "enjoin and bind non-parties to an action when needed to preserve the Court's ability to reach or enforce its decision in a case over which it has proper jurisdiction." *United States v. Int'l Bhd. of Teamsters*, 266 F.3d 45, 50 (2d Cir. 2001); *see also In re Lease Oil Antitrust Litig. No. II*, 48 F. Supp. 2d 699, 707 n.8 (S.D. Tex. 1998) (Jack, J.) (noting that "a federal court even has the power to enjoin non-parties under the All Writs Act in certain circumstances").  The scope of the Court's Order shall thus include enjoining claims against Capital Financial by the Liquidating Trustee that were assigned by class members in the *Segner* action.

All of the interests noted in *Liles* are present in this case, with the sole difference being that the Court here is being asked to enjoin arbitration rather than litigation. The question before the Court, therefore, is whether the Court's authority to enjoin pending proceedings under the All Writs Act in aid of approving a "limited fund" settlement extends to arbitration proceedings. For the reasons stated below, the Court believes that its authority does extend to enjoining arbitrations under these circumstances.

There is no dispute that the individual class members have a substantive contractual right to arbitrate that is supported by provisions of the Federal Arbitration Act. *See In re Piper Funds, Inc.*, 71 F.3d 298, 303 (8th Cir. 1995). However, the Court is of the opinion that the guidance provided by *Ortiz* permits the approval of a "limited fund" settlement that would enjoin individual arbitration claims under these circumstances. In *Ortiz*, the Supreme Court noted that a "limited fund" class action settlement under Rule 23(b)(1)(B) created several concerns in light of the Rules Enabling Act and the Constitution, including, as noted above, individual class members' rights to due process and to a jury trial. *Ortiz*, 527 U.S. at 845-47. Nonetheless, the Supreme Court held that approval of a limited fund settlement was acceptable despite these implications. It is for this very reason that the Supreme Court adopted a narrow interpretation of the "limited fund" device that remained close to the historical model that existed prior to the passage of Rule 23(b)(1)(B). *See Ortiz*, 527 U.S. at 845 ("Even if we assume that some such tension is acceptable under the Rules Enabling Act, it is best kept within tolerable limits by keeping limited fund practice under Rule 23(b)(1)(B) close to the practice preceding its adoption."); *see also id.* at 842 (adopting a "limiting

construction [of Rule 23(b)(1)(B) that] finds support in the Advisory Committee's expressions of understanding, minimizes potential conflict with the Rules Enabling Act, and avoids serious constitutional concerns raised by the mandatory class resolution of individual legal claims").[14] *Ortiz* thus acknowledged that a "limited fund" class action settlement provided for by Rule 23(b)(1)(B), which by its nature would abridge the constitutional rights of class members by preventing them from pursuing litigation, *id.* at 845-47, was permissible in appropriate situations, despite the provision of the Rules Enabling Act that a federal rule shall not abridge any substantive right.

The Court is aware that, despite these authorities, enjoining arbitration presents a different situation than enjoining litigation. Indeed, throughout this litigation, the Court has been urged to follow the Eighth Circuit's decision not to enjoin arbitration proceedings in *In re Piper Funds*, 71 F.3d 298 (8th Cir. 1995). In *Piper Funds*, a nonprofit medical corporation, Park Nicollet, hired Piper, a capital management company, to manage its endowment fund. *Id.* at 299. The agreement between Park Nicollet and Piper contained a contractually-agreed arbitration clause, ensuring that all controversies between them should be determined by arbitration in accordance with the rules of the National Association of Securities Dealers ("NASD"). *Id.* Piper invested much of Park Nicollet's funds in its own mutual fund, whose shares subsequently lost 20% of their value due to investments in derivatives hit hard by rising interest rates. *Id.*

---

[14] The Court further notes that *Ortiz* made clear that the idea of a "limited fund" settlement was not created by Rule 23(b)(1)(B); the Rule merely "intended . . . to capture the 'standard' class actions recognized in pre-Rule practice." *Ortiz*, 527 U.S. at 843 (quoting Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments to the Federal Rules of Civil Procedure (I)*, 81 HARV. L. REV. 356, 394 (1967)).

A number of subsequent class actions by investors against Piper were consolidated in the District of Minnesota, raising numerous claims under federal and state securities laws and common law claims for misrepresentation and breach of fiduciary duty. *Id.*

In January 1995, Park Nicollet filed a Statement of Claim with the NASD, requesting an arbitration award of $4.5 million. Park Nicollet informed the NASD that it would elect not to participate in the class action, which was at that time uncertified. *Id.* at 300. In February 1995, Piper and the attorneys for the plaintiff class in the case before the District of Minnesota tentatively settled the class action for approximately $70 million. *Id.* On March 2, 1995, Park Nicollet advised the district court that it had chosen to resolve its dispute with Piper by arbitration, and that it had decided to opt out of the class action. *Id.* On March 3, 1995, however, the district court conditionally certified the proposed class, and issued an order under the All Writs Act enjoining all pending proceedings by absent class members, including Park Nicollet's arbitration claim, despite the fact that Park Nicollet had informed the district court that it was opting out of any class action.

On appeal, the Eighth Circuit vacated the district court's order and held that the district court had abused its discretion. The Eighth Circuit noted that a court's exercise of its authority under the All Writs Act must be "'agreeable to the usages and principles of law,' [28 U.S.C.] § 1651(a), which in this case include the [Federal Arbitration Act] as well as Rule 23." *Piper Funds*, 71 F.3d at 300 n.2. The Eighth Circuit held that the district court's reason for granting the injunction, preserving a carefully negotiated class settlement agreement, was not a sufficient basis to limit Park Nicollet's contractual right

47

to arbitrate under the FAA. The court determined that "Park Nicollet's contractual and statutory right to arbitrate may not be sacrificed on the altar of efficient class action management." *Id.* at 303.

Some objectors in this case have argued that *Piper Funds* dictates that the Court cannot stay arbitration proceedings under the All Writs Act. However, the Court is convinced that *Piper Funds* does not govern this situation. The proposed settlement in *Piper Funds* did not invoke the "limited fund" mandatory class action settlement device, and allowed class members the opportunity to opt out. Park Nicollet had notified the Court of its desire to opt out of the settlement before the Court had issued its order, and the Eighth Circuit ruled that the district court abused its discretion in preventing Park Nicollet from doing so. *Id.* at 303-04. If the proposed settlement in this case were not a "limited fund" settlement under Rule 23(b)(1)(B) that did not provide for an opportunity to opt out, *Piper Funds* would likely provide the Court with proper guidance. Indeed, when additional funds are available beyond the settlement fund established by a proposed settlement, a court would have no basis to enjoin other proceedings that could access other sources of funds.

In this case, however, the Court has determined that a "limited fund" is present, and class members have no opportunity to opt out of such a settlement under Rule 23(b)(1)(B), in order to ensure that the funds remaining for all claimants were preserved and distributed in a fair and equitable manner. The circumstances in this case are fundamentally different from those faced in *Piper Funds*, and the Court is convinced that they require a different approach. The Eighth Circuit reversed the district court in

48

*Piper Funds* because it determined that the district court's basis for enjoining the arbitration was insufficient. The district court's reasoning for its order enjoining the arbitration was "because an arbitrator's 'ruling on whether or not Piper made fraudulent representations could jeopardize' the 'carefully negotiated' class action settlement." *Id.* at 303. In this case, however, the Court's reasoning and justification for enjoining the arbitrations of class members is very different from the district court's reasoning in *Piper Funds.* Most importantly, the Court's concern here is not to efficiently manage and preserve the class action settlement, but to preserve and ensure the fair distribution of the limited amount of capital available for settlement, which would be depleted regardless of the conclusions of individual arbitrators because of the cost of defending those arbitrations. Indeed, even if Capital Financial emerged victorious from the arbitrations going forward, the "limited fund" would be swiftly depleted by the vast attorneys' fees needed for its defenses in numerous arbitrations. *See Reserve Fund*, 673 F. Supp. 2d at 204 (issuing an injunction of individual class members' litigation under the All Writs Act when "dealing with a limited res that is likely to be dissipated absent an injunction"). Therefore, the situation in this case is distinguishable from *Piper Funds.* As the Court has determined that a "limited fund" does exist in this case, there is justification for enjoining arbitration claims brought by other class members.

It is true that other cases involving enjoining claims under the "All Writs Act" have largely involved enjoining litigation, not arbitration. *E.g. Liles*, 350 F.3d at 746-47; *Baldwin-United*, 770 F.2d at 337-38; *Reserve Fund*, 673 F. Supp. 2d at 204; *Williams*, 237 F.R.D. at 699-700. However, the reasoning behind enjoining other proceedings in a

49

"limited fund" situation is the same regardless of whether those proceedings are litigations or arbitrations. As in *Williams*, "[t]he prosecution of separate actions," regardless of their nature, against Capital Financial "unquestionably creates a risk of adjudications that, as a practical matter, would be dispositive of the interests of class members not parties to the adjudications or would substantially impair or impede their ability to protect their interests." *Williams*, 237 F.R.D. at 693. The necessary circumstances for a "limited fund" settlement that protects the interests of class members are present, despite the fact that the individual claims are brought in arbitration rather than litigation.

The Court is well aware of oft-noted "federal policy favoring arbitration," *e.g. Moses H. Cone*, 460 U.S. at 24, which provokes serious caution whenever a district court considers enjoining arbitration. Nonetheless, the Court would feel very uncomfortable endorsing a legal structure that allows a court to approve a "limited fund" class action that abridges one's constitutional right to a jury trial, but renders a court powerless to abridge one's contractual right to arbitration under the exact same circumstances. *See In re Painewebber Ltd. P'ships Litig.*, No. 94 CIV. 8547 SHS, 1996 WL 374162, at *4 (S.D.N.Y. July 1, 1996) (holding that "it would be incongruous if the Court had the authority to stay pending litigation, but not to enjoin arbitration, 'in aid of its jurisdiction' even before judgment is entered."). Such a result may imply that a contractually-provided right is more protected than rights provided by the Fifth or Seventh Amendments to the Constitution. As the Supreme Court acknowledged in *Ortiz* that "limited fund" settlements are permissible despite their abridgement of constitutional

rights to a jury trial and due process, the Court is of the opinion that the Rules Enabling Act does not foreclose the Court from abridging contractual rights to arbitration.

It is important to note, however, that an exercise of a district court's authority to enjoin arbitration must be limited to situations where it is necessary to do so. The Court would be reluctant to expand its holding to situations beyond the extraordinary circumstances of a "limited fund" settlement where it is necessary to exercise its power under the All Writs Act to ensure a fair and just result for class members, particularly in situations where such an exercise of authority would run counter to the federal policy favoring arbitration. If the Court were considering a non-"limited fund" settlement that provided class members the ability to opt out, the Court would not be willing to "sacrifice" individual class members' contractual right to arbitrate "upon the altar of efficient class action management." *Piper Funds*, 71 F.3d at 303. However, the circumstances faced by the Court in this situation go beyond the desire to promote "efficiency"; instead, the Court is faced with a situation of necessity. Had the Court not enjoined the arbitrations at first, and declined to exercise its authority to permanently enjoin the arbitrations by way of approving this proposed settlement, the proposed "limited fund" would have been depleted, undermining the Court's ability to approve the proposed settlement and ensuring that the vast majority of class members, if not all class members, received nothing. Allowing any competing proceedings to go forward, regardless of their nature, would have interfered with the Court's jurisdiction to consider the settlement before it. Therefore, the Court holds that a federal court's power under the

51

All Writs Act to enjoin competing proceedings by individual class members to protect its jurisdiction over a class action settlement can be exercised over arbitration proceedings when a mandatory "limited fund" situation exists.  Such a result is appropriate under the All Writs Act, and is not prevented by the Federal Arbitration Act or the Rules Enabling Act.[15]  The objections to the settlement concerning the Court's power under the All Writs Act to enjoin arbitrations, including those of the Bensons and the Slominskis, are accordingly overruled.[16]

## IV. Appointment of Settlement Class Counsel

Rule 23(g) provides, in relevant part, "(1) Unless a statute provides otherwise, a court that certifies a class must appoint class counsel.  In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  The Court may also "consider any other matter pertinent to

---

[15] The Court notes that it need not address the Rule 23(b)(3) requirements of predominance and superiority in its consideration of this proposed settlement, which was brought under Rule 23(b)(1)(B) rather than Rule 23(b)(3).  *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3d Cir. 2009) (holding that "there is no predominance or superiority requirement" when a district court is considering a Rule 23(b)(1)(B) class certification).

[16] In their objection, the Slominskis note that they have raised claims against several other entities unrelated to Capital Financial in their arbitration proceeding regarding non-Provident-related securities.  This Order shall not affect their right to pursue claims against entities other than Capital Financial.

counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Here, all of the aforementioned factors provided by Rule 23(g)(1) support appointing Girard Gibbs LLP and Zwerling, Schachter & Zwerling, LLP as settlement class counsel in this case. Both of these firms have performed substantial work on this action and have substantial experience in class action litigation work. Both firms, through their submissions to the Court, have demonstrated that they have knowledge of the relevant applicable law and that they have and will contribute substantial resources to implementing the proposed settlement. Accordingly, the Court hereby appoints Girard Gibbs LLP and Zwerling Schachter, & Zwerling, LLP as class counsel for purposes of approval of this class action settlement.

Additionally, the parties seek appointment of Sommerman & Quesada, L.L.P., Passman & Jones, P.C., Rochelle McCullough, LLP and Fleming & Associates, L.L.P. as subclass counsel for an "Assigned Claims Subclass" consisting of the claims of those who have assigned their claims to Milo Segner, the Liquidating Trustee of the Provident Royalties Liquidating Trust. The Court has reviewed this request, and, being satisfied that the requirements of Rule 23(g) are met, hereby appoint those firms as counsel for Milo Segner, who shall be the representative of this Assigned Claims Subclass.

### V. Notice to Class Members

Rule 23(c)(2)(A) provides, "For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class." Rule 23(e)(2) requires the Court "to direct notice in a reasonable manner to all class members who would be bound by the

proposal."   In this case, notice was provided of this proposed settlement to all class members by first class mail sent out on February 2, 2011.  The Court has reviewed the notice and finds it to be in compliance with the relevant provisions of Rule 23(c) and Rule 23(e).  The notice clearly provided the nature of the action, the definition of the Settlement Class, the terms of the settlement, the class members' options, including the fact that they could not exclude themselves, the claims, defenses, and issues, and the procedures surrounding the settlement.  Class members were further provided with the date of the fairness hearing and were given the opportunity to object to the settlement, which was described in clear terms.  *See* Pl.'s Appx., *Stott* Docket No. 4, at 86.  The scope of the class and effect of the Court's potential approval of the settlement were clearly explained to the recipients of the notice.  Such notice successfully "fairly apprised the prospective members of the class of the terms of the settlement and the options that are open to them," and provided them with "sufficient information for them to make a 'rational decision whether they should intervene in the settlement approval procedure.'" *Maher v. Zapata Corp.*, 714 F.2d 436, 451 (5th Cir. 1983) (citation omitted). Accordingly, the requirements of Rule 23(c) and Rule 23(e) as to notice are satisfied, and the Court finds that class members have been given reasonable notice.  *In re Dell Inc.*, No. A-06-CA-726-SS, 2010 WL 2371834, at *5 (W.D. Tex. June 11, 2010) (Sparks, J.); *Schwartz v. TXU Corp.*, No. 3:02-CV-2243-K (lead case), 2005 WL 3148350, at *11 (N.D. Tex. Nov. 8, 2005) (Kinkeade, J.).

## VI. Whether the Proposed Settlement Satisfies Rule 23(e)

Having determined that the class may be certified under Rule 23(a) and Rule 23(b)(1)(B), the Court now addresses whether the settlement may be approved under Rule 23(e). In regard to a proposed class action settlement, Rule 23(e)(2) provides, "If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." The Fifth Circuit has provided six factors for district courts to consider in determining if a settlement satisfies the "fair, reasonable, and adequate" standard:

> (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members.

*Newby*, 394 F.3d at 301; *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983). These factors are commonly referred to as the *Reed* factors, and the Court will address each of them in turn. The Court will also address any objections to the settlement in regard to the *Reed* factor that they relate to for the Court's consideration.

### 1. Evidence that the Settlement was Obtained by Fraud or Collusion

As to the first factor, there is no evidence that the settlement was obtained by fraud or collusion. This settlement came about when the parties agreed to present it to the Court for certification before no funds whatsoever were available to the class as a whole. It was not a negotiated amount, but the amount remaining from Capital Financial's insurance policy and an amount mandated by FINRA. The proposed settlement also does not favor any class member or group of class members, which also weighs against any

evidence of fraud or collusion and in favor of approval. *Vaughn v. Am. Honda Motor Co.*, 627 F. Supp. 2d 738, 748 (E.D. Tex. 2007) (Ward, J.). The Court thus finds that this factor weighs in favor of approval.

### 2. Complexity, Expense, and Likely Duration of the Litigation

The second factor addresses the complexity, expense, and likely duration of the litigation. The Court is of the opinion that this factor weighs in favor of approval of the settlement. There is no doubt that this litigation is particularly complex, especially as it implicates not only litigation under securities law, which "on the whole is 'notoriously difficult and unpredictable,'" *Dell*, 2010 WL 2371834 at *7 (quoting *Maher*, 714 F.2d at 455), but the intersection of a class action settlement and individual class members' rights to arbitration. Were this litigation to continue, which would almost certainly take a substantial amount of time and effort, the expense of litigating the claims would likely exceed the amount even available for recovery,[17] and the attorneys' fees expended by Capital Financial in defending this suit, as well as numerous arbitration proceedings brought by individual class members, would swiftly deplete any funds available. *See Williams*, 237 F.R.D. at 695 (holding this factor to support settlement in a

---

[17] As an example, the Court recently approved a proposed class action settlement with three other defendants in this litigation, which required a similar amount of work by class counsel. In that instance, the amount of attorneys' fees based on the hourly rate, or the lodestar calculation, amounted to over $9 million, and the total amount of attorneys' fees after applying the *Johnson* factors and other relevant standards was over $18 million. *See* Order Granting Class Counsel's Motion for Attorneys' Fees and Reimbursement of Expenses, *Billitteri* (3:09-cv-1568-F) Docket No. 473, at 18-19. Either amount would obviously dwarf the entire amount of the settlement contemplated here.

similar situation where pursuit of hundreds of individual claims would result in the defendant's insolvency).

Furthermore, as Judge Sparks remarked in *Dell*, "[s]ecurities claims are difficult to prove, and without agreeing to a settlement, Plaintiffs no doubt face unpredictable and significant delays and expense in prosecuting this case." *Dell*, 2010 WL 2371834 at *7. In the event of a trial, "they would face tall hurdles in establishing the elements of their claims in the district court and convincing the jury of liability and the amount of damages." *Id.* Plaintiffs in this case would have the further unenviable task of surviving a motion for summary judgment, class certification, and an almost-certain appeal. *See DeHoyos*, 240 F.R.D. at 291-92 (holding that the complexity, expense, and likely duration factor to favor approval of the settlement when further proceedings would include class certification, dispositive motions, Rule 23(f) appeal, trial, and further appeals). The Court has little doubt that the amount of time it would take to recover on behalf of class members, many of whom invested substantial portions of their retirement investments in this alleged Ponzi scheme, would measure in years rather than the months contemplated by the parties at this stage were the Court not to approve this settlement. *See Schwartz*, 2005 WL 3148350 at *19 (weighing a potential "delay in the receipt of any relief" in favor of approving a proposed settlement). There is the further possibility that failure to approve the settlement could result in Capital Financial's insolvency and potentially no recovery whatsoever for class members. *See Williams*, 237 F.R.D. at 695 (holding this factor to favor approval of "limited fund" settlement when allowing continued litigation of the class action and competing individual actions would result in

no benefits or the loss of benefits to the class because of the defendant's likely resulting insolvency).  Considering the potential road ahead for the litigants, and that failure to approve the settlement could result in no recover for any class member at all, the second factor weighs strongly in favor of approving this settlement.

### 3. Stage of Litigation and Availability of Discovery

The third consideration is the stage of litigation and availability of discovery.  This litigation has been ongoing for over two years.  This process of approving the proposed settlement has been ongoing since December, and the parties and the Court are very aware of the magnitude of the case and the positions of the parties.  Although there has not been a full range of discovery in this case, sufficient information has been disseminated to give the Court and the parties an effective view of the important issues.  Additionally, the Court did issue an Order compelling at least some discovery as to individuals' financial information in regard to this proposed settlement.  *See* Order, *Billitteri* Docket No. 386, at 5-6.  In any case, "the lack of [formal discovery] does not compel the conclusion that insufficient discovery was conducted" for the purposes of settlement approval.  *Cotton*, 559 F.2d at 1332.  At this stage, the Court and the parties "possess ample information with which to evaluate the merits of the competing positions."  *Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004).  Accordingly, this factor favors approval of the settlement.

### 4. Probability of Success on the Merits

The Court now addresses the fourth factor of the probability of success on the merits, which the Fifth Circuit has identified as the "most important factor."  *Parker v.*

*Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982). "A district court faced with a proposed settlement must compare its terms with the likely rewards the class would have received following a successful trial of this case." *Reed*, 703 F.2d at 172. Here, the Court is of the opinion that the potential result strongly favors approval of the settlement. If the class action had proceeded to trial and the class was to prevail, recovery from Capital Financial, which, as noted at a previous hearing, is perilously undercapitalized, would be extremely difficult. Class members would have to prove not only that the statements contained within the Private Placement Memoranda ("PPM") issued by Provident entities were false, but that Capital Financial knew or should have known of the untruths or omissions within the PPMs. Even if the class were victorious, however, the "likely rewards" to the class would likely be even smaller than what is currently contemplated because Capital Financial would have few assets to fund any award they receive. Furthermore, the costs of litigating this dispute with Capital Financial and the burdens that the class would have to overcome further include surviving renewed motions to dismiss and motions for summary judgment, obtaining class certification, convincing a jury at trial, and very likely overcoming an eventual appeal. *DeHoyos*, 240 F.R.D. at 291-92. The settlement contemplated here would avoid those costs and difficulties.

This litigation has already seen several broker-dealers, including defendants in the *Billitteri* case, cease operations or file for bankruptcy due to the expense of litigating claims. Such experience demonstrates that declining to approve this settlement would severely delay or prevent entirely any recovery on behalf of the class. Instead, approving

the settlement at this stage would provide an "immediate and automatic benefit to the class." *Vaughn*, 627 F. Supp. 2d at 747. Accordingly, taking these considerations into account, the Court is of the opinion that this factor weighs in favor of approving the settlement.

### 5. Range of Possible Recovery by the Class

The fifth factor is the range of possible recovery by the class. This factor includes an inquiry into whether the terms of the settlement "fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits." *Klein*, 705 F. Supp. 2d at 656 (emphasis in original) (quoting *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 849-50 (E.D. La. 2007)). "Under [the range of possible recovery] factor, 'a court should consider the views of objecting class members when their 'objections to the settlement agreement center on their view that the relief it provides is inadequate.'" *Klein*, 705 F. Supp. 2d at 656 (quoting *Ayers*, 358 F.3d at 370).[18] In assessing the potential range of recovery, the Court takes into account the risks involved in the litigation and the potential costs involved, and ultimately considers whether the settlement amount is fair and reasonable and falls within a reasonable range of recovery. *See id.* (citations omitted).

---

[18] Three class members, Terry and Carolyn Stanfield and Christine Meengs, had two different objections to the settlement: (1) the applicability of the "limited fund" doctrine, and (2) the amount of attorneys' fees. Stanfield Objection, *Billitteri* Docket No. 255, at 1-2; Meengs Objection, *Billitteri* Docket No. 262, at 1-2. The first of these objections was addressed in the substantive section of this Order addressing Rule 23(b)(1)(B). The second objection shall be addressed in a separate order regarding class counsel's motion for attorneys' fees.

Most of the objections to the settlement are relevant to this factor. Namely, class members largely object to the amount of the recovery, which admittedly amounts to a mere fraction of the losses.[19] The size of the recovery compared to the amount of claims asserted by the class is of deep concern to the Court. However, the Court must take into account the fact that, if this litigation were to continue and the class was to emerge victorious, they would possess a judgment worth millions with no one to collect it from. Furthermore, as the Court has previously noted, continued pursuit of these claims, either by individual class members or class counsel, will ensure the accrual of massive costs and likely deplete any amount available for recovery, with no guarantee that they will be able to succeed in this litigation. *See Williams*, 237 F.R.D. at 695 (approving "limited fund" settlement when "there is a substantial and documented risk that continued litigation of this case and various individual cases would result in [the settling defendant's] insolvency, thus denying class members any increase in policy benefits pursuant to the settlement and a probable loss of existing benefits as they now exist"). This settlement at least provides class members with some measure of recovery, and the Court is of the opinion that the settlement should be approved when the alternative is no recovery at all.

It is worth noting that this settlement does not resolve claims against all of registered representatives; it only releases claims against those who have submitted financial information to the Court. Furthermore, this settlement would not release claims

---

[19] The amount of the recovery for class members has been estimated at about 2 to 3 percent of the each individual class member's total losses.

against Capital Financial's parent company, Capital Holdings, against whom claims remain pending in the *Billitteri* case. Although this particular settlement only provides class members with a small percentage of their losses, it is important to note that recovery from individuals not covered by this settlement is still possible, and that class members may be able to obtain an additional recovery from Capital Holdings or individuals not released by this settlement.

Accordingly, there are competing considerations as to the fifth *Reed* factor. The fact that the recovery is only a small percentage of the class members' losses weighs against approval, but the risks involved in the litigation, the class's likelihood of success, the potential for Capital Financial to incur large litigation costs, and the likelihood that not approving the settlement will result in either an unfair recovery or no recovery at all weigh in favor of approval. In light of these considerations, the fifth factor weighs only slightly in favor of approving the settlement.

### 6. Opinions of Class Counsel, Class Representatives, and Absent Class Members

The final factor is the opinions of class counsel, class representatives, and absent class members. As class counsel tends to be the most familiar with the intricacies of a class action lawsuit and settlement, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330; *see also Reed*, 703 F.2d at 175. In this case, class counsel has informed the Court that the amount contemplated by this settlement was simply the most that counsel could gather for the class from Capital Financial, and any additional assets were either unavailable or, in the

cases of individual officers, directors, and registered representatives, not worth the expense of obtaining. After viewing the information provided to the Court, including financial information about Capital Financial and the relevant individuals who will be released from liability, the Court agrees with this assessment. The amount contemplated appears to have been all that class counsel could obtain for the class, and is an acceptable result particularly when the alternative is nothing at all. In regard to the assets of individual officers, directors, and registered representatives, the Court agrees with class counsel that obtaining their assets, which in many cases are negligible, would cost more than the amount that could possibly be obtained, and releasing those who have provided financial information to the Court from liability should not be an impediment to this "limited fund" settlement. Furthermore, the class representative in this case, Donald Stott, has indicated to the Court his approval of this proposed settlement.

The Court also takes the opinions of the two organized groups of objectors seriously into account. The Campen Intervenors and the Erickson Intervenors both sent representatives to the Court's first fairness hearing, and their cogent arguments about whether a "limited fund" exists in this case are what prompted the Court to request further information from the parties to conduct additional analysis of whether a "limited fund" existed in this case. However, one day before the second fairness hearing, both the Campen Intervenors and the Erickson Intervenors withdrew their objections to the proposed settlement. See Notices of Withdrawal, *Billitteri* Docket Nos. 484 & 485. The Campen Intervenors later notified the Court of their intention to participate in the settlement, contrary to their previous assertions to the Court. *See* Advisory, *Stott* Docket

No. 31.   Additionally, counsel for the Provident Royalties Liquidating Trustee, Milo Segner, who also previously objected to the settlement, did not raise his objections at the second fairness hearing, indicating that Segner would support the Court's ultimate decision.   The fact that these objectors, despite their previous opposition to the settlement, have withdrawn their objections and indicated their desire to participate in the settlement supports approval of the proposed settlement.

Certain class members, including the Bensons, the Slominskis, the Stanfields, and Meengs, have objected to certain terms of the proposed settlement, including the Court's enjoining of individual arbitrations, the applicability of the "limited fund" doctrine, and the small recovery, which would amount to about 2% to 3% of their investment losses. The "limited fund" arguments were addressed and rejected earlier in this Order. Regarding the contentions that the settlement is inadequate, although the Court is sympathetic to these objectors' circumstances, the Court is convinced that approval of this class action settlement is necessary to ensure a fair and just recovery for the entire class as a whole. Accordingly, the objections that remain in this case are overruled, and the Court finds the sixth factor to weigh in favor of approving the settlement.

*** 

Having assessed the *Reed* factors, the Court finds that the first, second, third, fourth, and sixth factors favor approval. While some of the considerations involved in the fifth factor weigh against the settlement, other considerations in regard to that factor weigh in favor of the settlement. Overall, the fifth factor slightly supports approval.

Accordingly, the Court is convinced that the settlement agreement is fair, reasonable, and adequate, and should be approved.

### Conclusion

For the reasons outlined above, the Court is of the opinion that this proposed settlement should be granted final approval. The Court is satisfied that it has the authority to enjoin the arbitrations at issue, that a "limited fund" exists in this case, and that the settlement meets all of the requirements of Rule 23. Accordingly, it is ORDERED that the Representative Plaintiff's Motion for Final Approval of Class Action Settlement with Capital Financial Services, Inc. is GRANTED.

The Court hereby ORDERS that all pending and future claims in arbitration and litigation against Capital Financial by members of the class certified in this Order, including but not limited to all pending arbitrations and the Provident Royalties' Liquidating Trustee's claims that were assigned by class members against Capital Financial in the case of *Segner v. Securities America, Inc.*, 3:10-cv-1884-F, are ENJOINED.

The Court shall separately issue an Order detailing the specific terms of the settlement and an Order on the pending motion concerning attorneys' fees. The Court shall also separately issue an Order of Final Judgment pursuant to Rule 58(a).

IT IS SO ORDERED.

Signed this 12th day of September, 2011.

Royal Furgeson
Senior United States District Judge

65

## APPENDIX A

List of Settling Defendant's Current and Prior Officers, Directors and
Registered Representatives Released by the Settlement

Dayton Ault

Larry Bakken

James Batten

Randall Benhke

David Bjork

Brian Boppre

James Brinkman

Harry Brown Jr.

John Carlson

Patrick Carney

Jacqueline Case

Carl Davis Jr.

Kala Duncan

Michael Eathorne

Larry Feldkamp

Daniel Flees

Kevin Fox

Robert Galloway

Gary Gent

Kyle Hoffman

Robert Jackson

John Jay John

David Johnson

Lloyd Johnson

Tom Kunkel

Robert Labonte

Jeff Lindsey

Drew MacEwan

Pam McClenney

Kevin Mickan

George Pitra

Theresa O'Clair

John Rose

Joseph Roubik

Anthony Savarese

Robert Scullen

Peter Shurow, Jr.

Peter Shurow, Sr.

Mark Sitter

Bradley Wells

Mark Witt